United States District Court
Southern District of Texas

**ENTERED**

October 23, 2015

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHAD HOLLEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ANDREW T. BLOMBERG, RAAD M. | § | CIVIL ACTION NO. H-10-2394 |
| HASSAN, PHILIP N. BRYAN, DREW | § | |
| W. RISER, IN THEIR INDIVIDUAL | § | |
| AND OFFICIAL CAPACITIES, | § | |
| and CITY OF HOUSTON, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending is Defendant City of Houston's Motion for Summary Judgment (Document No. 141). After carefully considering the motion, response, and applicable law, the Court for the reasons that follow concludes that the motion should be granted.

I.   Background

This suit arises from the March 23, 2010 beating and arrest of Plaintiff Chad Holley ("Holley"), a fifteen-year-old minor at the time, by officers of the Houston Police Department. Officers Andrew T. Blomberg ("Officer Blomberg"), Raad M. Hassan ("Officer Hassan"), Phillip N. Bryan ("Officer Bryan"), and Drew W. Ryser ("Officer Ryser"), (cumulatively referred to as the "Offending Officers"), along with other officers, responded to a report of a burglary with armed suspects. Seeing Holley fleeing on foot,

Officer Bryan attempted to block him from escaping by driving his police vehicle over a curb and into a fence.[1]  Holley attempted to hurdle the car and fell to the ground on the other side of the police vehicle, where he "lay on the ground and placed his hands behind his head and neck area, in an obvious position of surrender."[2]   "Video evidence shows that several officers surrounded Holley and struck and kicked him repeatedly.  Officers either struck or kicked Holley, and one officer kicked Holley after he was handcuffed and no longer a threat."[3]

After Holley was arrested, handcuffed, and in the process of being placed into the patrol car, Sergeant John W. McClellan ("Sergeant McClellan"), the Offending Officers' supervisor, arrived at the scene.[4]  Sergeant McClellan states that he "did not observe any injuries to Chad Holley or any other suspect on the scene" and was "not aware of any medical treatment needed or given to the suspects on the scene."[5]  Sergeant McClellan further states that he "walked over to the police car that Chad Holley was seated in and

---

[1] Document No. 141, ex. A [ex. 2a] at 1 of 5; id., ex. A [ex. 2b] at 115 of 154.

[2] Document No. 141, ex. A [ex. 2b] at 115 of 154.

[3] This characterization of the video evidence is confirmed in a Houston Police Department Inter Office Correspondence.  Id.

[4] Document No. 161-1 at 4 of 22.

[5] Id. at 5 of 22.

observed him sitting in the back seat."[6]  The officers took Holley,
along with another suspect in the burglary, to the Houston Police
Department Juvenile Division to be processed.[7]  No investigation
into the violent attack on Holley took place until a month later
when the City became aware of the incident after the Internal
Affairs Division (the "IAD") received from a citizen a surveillance
video of the Offending Officers beating Holley.[8]  Upon learning of
the misconduct alleged, the City's Chief of Police, Charles A.
McClelland, Jr. ("Chief McClelland"), adopted the complaint as the
complainant himself, and an investigation ensued by the IAD.[9]  As
a result of the IAD's investigation findings, the City terminated
Officers Blomberg, Hassan, Bryan, and Ryser, and indefinitely
suspended Sergeant McClellan.[10]

---

[6] Id.

[7] Document No. 141, ex. A [ex. 2b] at 122 of 154.

[8] Document No. 160 at 3 of 21 to 4 of 21.  The video was a
storage facility's surveillance video of its fence line, adjacent
to the scene where Holley was arrested, which by happenstance had
recorded the events, and the storage facility's attorney sent the
video to HPD's Internal Affairs Division.

[9] Id.

[10] Document No. 141, ex. A at 17.  Criminal charges were
brought against the Offending Officers.  Id.  A jury found Ryser
guilty of the misdemeanor of official oppression, but Blomberg was
acquitted.  Id.  Hassan and Bryan reached plea agreements.  Id.

3

The uncontroverted summary judgment evidence is that none of the Offending Officers had ever had complaints sustained against them for wrongful use of force before this incident.[11]

Holley's mother filed this suit on behalf of her minor son against Officers Hassan, Blomberg, Bryan, Ryser, and the City of Houston (the "City"), alleging, *inter alia*, that the City's "policies, practices and customs were a moving force in causing the unconstitutional conduct," and that "there was a failure to

---

[11] The Complaint Histories of the Offending Officers reflected the following:

Officer Hassan, in more than six years of work for the City, had complaints sustained against him for (1) one at-fault accident, (2) two complaints of misconduct, and (3) one complaint about conduct and behavior. Officer Hassan's Complaint History lists two additional complaints from which he was exonerated. Document No. 151-1 at 14 of 21.

Officer Bloomberg, in his approximate three years of work for the City, had two at-fault accidents and one failure in completing official reports. Officer Blomberg's Complaint History lists five additional complaints that were either not sustained or not justified. Document No. 151-2 at 8 of 21.

Officer Bryan, in nearly twenty years as a police officer for the City, had complaints sustained against him for (1) an at-fault accident, (2) misconduct, (3) conduct and behavior, (4) court attendance, (5) completing official reports, and (6) improper police procedure. During these two decades, five complaints were made against Officer Bryan for the use of force, all of which were either not sustained or never formalized. Document No. 152 at 7 of 22.

Officer Ryser, in the approximate three years that he worked for the City, had two complaints sustained against him, one for an at-fault accident and one for improper police procedure. One complaint was made against him for use of force, which was not sustained. Document No. 151-2 at 17 of 21; Document No. 152 at 5 of 22 to 6 of 22.

supervise or correct wrongful behavior by these officers," and that "there was a culture of silence and toleration of such conduct and/or there was a failure to train on non-lethal use of force."[12] Holley has settled his claims against Officers Blomberg, Hassan, Bryan, and Ryser, leaving only Holley's claims against the City.[13] The City does not dispute that the four Offending Officers violated Holley's constitutional rights, but moves for summary judgment, arguing that Holley cannot satisfy the elements required to hold the City of Houston liable under 42 U.S.C. § 1983 for the Offending Officers' misconduct.[14]

## II.  Legal Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted.  Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).  A party opposing a

---

[12] Document No. 69 (Pl.'s 2d Am. Consolidated Compl.).  Holley was substituted as Plaintiff after he attained his majority.

[13] Document No. 123.  Officers Bryan's and Ryser's cross claims against the City were dismissed on their own motions.  Document Nos. 127, 128.

[14] Document No. 141.

properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record [. . .]; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's]

favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

### III. Analysis

The Civil Rights Act of 1866 creates a private right of action for redressing the violation of federal law by those acting under color of state law. 42 U.S.C. § 1983; Migra v. Warren City Sch. Dist. Bd. of Educ., 104 S. Ct. 892, 896 (1984). Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights conferred elsewhere. Albright v. Oliver, 114 S. Ct. 807, 811 (1994).

A municipality can be held liable under § 1983 only when the municipality itself causes a constitutional deprivation. See City of Canton v. Harris, 109 S. Ct. 1197, 1203 (1989); Monell v. Dept. of Soc. Servs., 98 S. Ct. 2018, 2037-38 (1978). This requires the execution of an official city policy or custom which results in the injury made the basis of the § 1983 claim. Monell, 98 S. Ct. at 2035-36. Proof of municipal liability sufficient to satisfy Monell requires: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. Pineda v. City of Houston, 291 F.3d 325, 328

7

(5th Cir. 2002).   A high standard of proof is required before a municipality can be held liable under § 1983.   *See* <u>Snyder v. Trepagnier</u>, 142 F.3d 791, 796 (5th Cir. 1998); *see also* <u>Bd. of Cnty. Comm'rs v. Brown</u>, 117 S. Ct. 1382, 1394 (1997) ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability [improperly] collapses into *respondeat superior* liability."); <u>Canton</u>, 109 S. Ct. at 1208 (O'Connor, J., concurring) (Section 1983 liability should not be imposed absent a showing of "a high degree of fault on the part of city officials").

For purposes of municipal liability, an official policy may be (1) a policy statement, ordinance, or regulation, or (2) "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." <u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 579 (5th Cir. 2001) (quoting <u>Webster v. City of Houston</u>, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*)). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." <u>Spiller v. City of Texas City</u>, 130 F.3d 162, 167 (5th Cir. 1997).

The parties do not dispute that Holley had a constitutional right to be free from unreasonable and excessive force and that the

Offending Officers violated that right, but they dispute whether the City is liable for that violation. Holley advances a variety of theories including: (1) the City's official policies and customs were defective and caused the violation of Holley's rights; (2) the City failed properly to train its officers; (3) the City failed to supervise its officers; (4) the City ratified the Offending Officers' actions; and (5) the City failed properly to investigate this incident.[15] The City argues that Holley does not have summary judgment evidence sufficient to raise a genuine issue of material fact on any of these claims.[16]

A.   Official Policy

The Fifth Circuit has succinctly summarized the controlling cases regarding a City's official policies as follows:

> Under the decisions of the Supreme Court and this court, municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom. Monell v. Dep't. of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Monell and later decisions reject municipal liability predicated on respondeat superior, because the text of section 1983 will not bear such a reading. Bd. of Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated

---

[15] Document No. 150.

[16] Document No. 141.

unconstitutional actions by municipal employees will almost never trigger liability. <u>Bennett v. City of Slidell</u>, 728 F.2d 762, 768 n.3 (5th Cir. 1984), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985); <u>McKee v. City of Rockwall</u>, 877 F.2d 409, 415 (5th Cir. 1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 727, 107 L.Ed.2d 746 (1990).

<u>Piotrowski v. City of Houston</u>, 237 F.3d 567, 578 (5th Cir. 2001). As for the instant case, it has regularly been observed that the City of Houston's presumptive policymakers are its Mayor, City Council, and Chief of Police.[17]   There is no summary judgment evidence here that the City's policymaker was other than the Mayor, City Council, and/or Chief of Police.

Holley argues that the City's General Order, Use of Force, 600-17 ("General Order 600-17") and Standard Operating Procedure, Use of Force, Arrest and Apprehension, 200/2.22 ("Standard Operating Procedure 200/2.22") are defective because the policies (1) did not "define the important legal standard of 'reasonably necessary,'" (2) did not "define what would occur to an officer if he/she fails to use reasonable force," and (3) "lacked adequate reporting and/or accountability requirements for all types of use of force."[18]

---

[17] <u>Id.</u> at 579.

[18] Document No. 150 at 9 of 27 to 10 of 27.

General Order 600-17 states

When dealing with citizens, suspects, and prisoners, employees will limit their use of force and physical contact to only the amount reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control.[19]

The official written policy among other things defines certain terms, outlines the procedures for using various types of weapons, and includes reporting and documentation requirements for when an employee uses force.[20] Standard Operating Procedure 200/2.22 states among other things that the City's officers have the responsibility "[t]o use appropriate force in response to a threat to life or serious bodily injury, in protection of property, to effect an arrest, or to quell a disturbance," and that "along with [an officer's] authority, comes the responsibility to be wise and prudent, and the need for restraint in its application."[21] Additionally, "Police officers are authorized to use only that amount of force necessary to effect an arrest or for the protection of him/herself or others."[22]  The Standard Operating Procedure further outlines the tasks to be completed when force is used, specifically requiring that "[a] supervisor will make the scene" in

---

[19] Document No. 141, ex. 16 at 1 of 5.

[20] Id., ex. 16 at 1 of 5 to 5 of 5.

[21] Document No. 151 at 14 of 21.

[22] Id.

11

the event that "force is used by an employee that results in an injury to any person."[23]

Holley does not argue that either General Order 600-17 or Standard Operating Procedure 200/2.22 is facially unconstitutional; rather, Holley argues that these official policies should have been better written by the City to prevent the deprivation of Holley's constitutional rights.  A facially innocuous policy will support liability "if it was promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." Piotrowski, 237 F.3d at 579 (citation and quotation marks omitted).  "Deliberate indifference of this sort is a stringent test, and a showing of simple or even heightened negligence will not suffice to prove municipal culpability." Id. "[D]emonstrating that a policy reflects deliberate indifference 'generally requires that a plaintiff demonstrate at least a pattern of similar violations.'" Walker v. Upshaw, 515 F. App'x 334, 341 (5th Cir. 2013) (citations omitted).

There is no summary judgment evidence that the City was deliberately indifferent in the formulation and adoption of formal policies stating the lawful limits of an officer's use of force in effecting an arrest.  Indeed, the summary judgment evidence demonstrates as a matter of law that if the Offending Officers had adhered to the City's official written policies, Holley would not

---

[23] Id.

have sustained a violation of his constitutional right to be free from unreasonable and excessive force.

Holley also argues, however, that there were "similar incidents" such as to "establish[] official policy" to allow excessive force to be used by the City's officers.[24]  Holley describes only one other incident, however, stating that less than two weeks before the Holley incident, "a young man, Denzel Thomas, while walking from burger king was approached by officers Ryser, Hassan and Bryan, while under the color of law, and threw him onto the ground and began to beat, kick and punch him, violating his constitutional rights to be free from excessive force."[25]  Holley produces unsworn statements from Thomas, Thomas's mother, and two other persons as summary judgment evidence of the beating of Thomas.[26]

"Where prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice

---

[24] Document No. 150 at 21 of 27.

[25] Id. at 21 of 27 to 22 of 27.

[26] Document No. 156 at 2 of 20 to 12 of 20,  14 of 20 to 20 of 20; Document No. 156-1 at 3 of 9 to 9 of 9.  Police reports also in Plaintiff's summary judgment evidence state that Thomas met the description of a robbery suspect who, when he was approached, assaulted an officer, resisted arrest, and was found to be in possession of cocaine and marijuana.  He was charged with assault of an officer.

of city employees." <u>Peterson v. City of Fort Worth, Tex.</u>, 588 F.3d 838, 850 (5th Cir. 2009) (citation and internal quotation marks omitted).  Additionally, "[a] pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" <u>Id.</u> (quoting <u>McConney v. City of Houston</u>, 863 F.2d 1180, 1184 (5th Cir. 1989).  Here, Plaintiff's description of one prior incident days earlier by three of the Offending Officers is insufficient as a matter of law to raise a fact issue that there was a pattern of such violations "for so long or so frequently" as to attribute to the Mayor and City Council, and/or the Chief of Police, knowledge that such wanton misconduct is the expected, accepted practice for City employees, and hence an official policy of the City.

Holley further argues that Sergeant McClellan "was aware that officers Bryan, Ryser and Bloomberg had previous incidents regarding the use of force on those whom they encounter," and attributes his knowledge to the City.[27]  Holley evidently relies on

---

[27]  Document No. 141 at 13 of 27.  The summary judgment evidence, which contains these officers' Complaint Histories, reflects that the following complaints were made against them related to use of force:

(1)  Officer Bryan in nearly 20 years of service received five use of force complaints, one of which did not have a reported disposition, and others either were not sustained or never formalized. Document No. 152 at 7 of 22.

(2)  Officer Ryser had one sustained complaint for failing properly to document his use of force, but none for use of excessive force.  Document No. 152 at 5 of 22 to 6 of 22.

14

incidents where complaints about excessive use of force were not validated.  Again, "[w]here prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."  Peterson, 588 F.3d at 850 (citation and internal quotation marks omitted).  Additionally, "[a] pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'"  Id. (quoting McConney v. City of Houston, 863 F.2d 1180, 1184 (5th Cir.1989)).  These few use of force complaints made against the Offending Officers over a period of years--none of which was sustained as meritorious--are insufficient to raise a genuine issue of material fact that there was a pattern of use of force violations by the Offending Officers to which the City's policymakers--its Mayor and City Council and/or its Chief of Police--were deliberately indifferent such as to adopt such misconduct as the City's official policy.  Sergeant McClellan was not the City's policymaker, and his alleged knowledge or belief that three of the Offending Officers had committed excessive force is not attributable to the City lest "municipal liability collapses

---

(3)   Officer Blomberg was the subject of two use of force complaints, neither of which was sustained. Document No. 151-2 at 8 of 21.

Officer Hasaan had no history of any use of force complaints being made against him.  Document No. 151-1 at 14 of 21.

15

into *respondeat superior* liability." <u>Brown</u>, 117 S. Ct. 1382 at 1394.

B.   <u>Failure to Train</u>

To succeed on a claim for failure to supervise or train against either a municipality or an individual, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of [her] rights; and (3) the failure to train or supervise amounts to deliberate indifference." <u>Lewis v. Pugh</u>, 289 F. App'x 767, 771-72 (5th Cir. 2008) (quoting <u>Smith v. Brenoettsy</u>, 158 F.3d 908, 911-12 (5th Cir. 1998)); <u>Hinshaw v. Doffer</u>, 785 F.2d 1260, 1263 (5th Cir. 1986). "Where a plaintiff fails to establish deliberate indifference, the court need not address the other two prongs of supervisor liability." <u>Goodman v. Harris Cnty.</u>, 571 F.3d 388, 395 (5th Cir. 2009) (citations omitted).  "Deliberate indifference requires a showing of more than negligence or even gross negligence." <u>Estate of Davis v. City of North Richland Hills</u>, 406 F.3d 375, 381 (5th Cir. 2005). "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference.  The plaintiff must generally demonstrate at least a pattern of similar

violations." <u>Thompson v. Upshur Cnty.</u>, 245 F.3d 447, 459 (5th Cir. 2001) (citations omitted).

    1.   Permitting Officers to Deviate from Training

    Holley's initial failure to train argument, although awkwardly worded, asserts that the City "had a custom and/or wide-spread practice in place that permitted its officers to deviate from the inadequate training taught by the City and pursuant to its official policy, with regard to discretion and reasonableness, as well as Defendant's customs."[28]  The Court infers Plaintiff is alleging a City custom and practice regularly to allow officers to deviate from their training.  According to the Fifth Circuit, "[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability."  <u>Piotrowski</u>, 237 F.3d at 581 (quoting <u>Bennett v. City of Slidell</u>, 728 F.2d 762, 768 n. 3 (5th Cir. 1984)).  Holley cites no summary judgment evidence of any persistent, often repeated, or constant violations of official training such as to constitute a City policy of customarily permitting officers to ignore or deviate from their training.  The City is entitled to summary judgment on this claim.

---

[28] <u>Id.</u> at 15 of 27.

17

2.    "Adrenaline Dump" Training

Holley also contends that the training itself was inadequate, arguing that the City was deliberately indifferent to what he conclusorily describes as the problem of adrenaline dump,[29] which he argues was the moving force behind the Offending Officers' violation of Holley's constitutional rights.[30]

The Fifth Circuit has held that "if the training of police officers meets state standards, there can be no cause of action for a failure to train absent a showing that this legal minimum of training was inadequate to enable [the officers] to deal with the usual and recurring situations faced by jailers and peace officers." O'Neal v. City of San Antonio, 344 F. App'x 885, 888 (5th Cir. 2009) (internal quotation marks omitted) (quoting Benavides v. Cnty. of Wilson, 955 F.2d 968, 973 (5th Cir. 1992)).

---

[29] Holley's expert, Paul L. Miller, quotes an article from Lawman Magazine in explaining the term adrenaline dump, stating

> [t]he speed, siren and desire to apprehend can cause an officer's adrenaline level to soar.  Once the huge adrenaline dump occurs, things can go from bad to worse. Tunnel vision and/or target fixation can set in.  Fine and complex motor skills diminish, and short-term memory (the creative/reasoning part of the brain) can essentially shut down, leaving an officer with nothing more than long-term memory and primal, emotional instincts to operate with.

Document No. 151 at 10 of 21.

[30] Document No. 69 ¶ 4.3.

18

The City's uncontroverted summary judgment evidence shows that the City's training program required at least twice the amount of training mandated by state standards.  The City's cadet training program required the Offending Officers to complete from 1,440 to 1,485 hours of training.[31]  The syllabi show that the City provided training in numerous courses that include and teach in context the lawful use of force and appropriate officer conduct in stressful settings, or what Plaintiff calls "adrenaline dump" circumstances, including Psychology of Policing/Stress Management; U.S. & Texas Constitution/Bill of Rights; Professional Demeanor & Ethics; Texas Code of Criminal Procedure; Professional Policing; Texas Penal Code 1; Texas Penal Code 2; Laws of Arrest, Search, and Seizure; Civil Law and Liability; General Orders 600; Use of Force; Officer Safety Awareness; Defensive Tactics; Conflict Resolution/Scene Management; Arrest Procedures; High Stress; and Human Relations.[32] The summary judgment evidence further establishes that the City required its officers to obtain extensive additional training after graduating from the cadet academy, including: Probationary Police Officer Field Training for 12 to 16 weeks; a Mentor Program, which, with the other training, lasts for one year from the date the individual was hired as a cadet; and In-Service Continuing Law Enforcement Education, which required a minimum of 40 hours of

---

[31] Document No. 141, ex. A at 6 of 22.

[32] Id., ex. A [exs.5a-5d].

19

training per year.[33]   The City's summary judgment evidence also includes certification records for each of the Offending Officers showing that each officer successfully completed the required additional training after his graduation from the cadet academy.[34]

By comparison, the Texas Commission on Law Enforcement ("TCOLE"), which sets the requirements for law enforcement training in Texas, requires that new cadets complete a Basic Police Officer Course, which from January 1, 2005 to December 31, 2012 required 618 hours of training.[35]   TCOLE also mandates that officers receive 40 hours of continuing education every 24 months.   TEX. OCC. CODE ANN. § 1701.351 (a).   Thus, the City's training not only met but far exceeded the state standards of training set forth by TCOLE.

On this summary judgment record, Plaintiff has not raised a genuine issue of material fact that the City's officer training, which is far more robust than that mandated by the State of Texas, was inadequate to train the City's officers to deal appropriately with the usual and recurring situations encountered in high stress situations.   The City is entitled to summary judgment on Holley's failure to train claim.

---

[33] Id., ex. A at 9 of 22 to 15 of 22.

[34] Document Nos. 141-9, 141-10, 141-11, 141-12.

[35] Texas Commission on Law Enforcement: Out of State Peace Officers, http://www.tcole.texas.gov/content/out-state-peace-officers (last visited on July 22, 2015) (noting number of hours required in the basic peace officer training course).

C.   Failure to Supervise

   To support his claim that the City failed to supervise its
officers, Holley makes a broadside argument that "the City of
Houston, by the very language in its official policy and by its
policymakers, take the accountability and supervisory responsi-
bilities out of the hands of its supervisors and places it into the
hands of the actual officers that are making the decisions, taking
discretionary measures and making exceptions to use excessive force
on others and violating their constitutional rights."[36]  Plaintiff
points to no such "language in [the City's] official policy" and
presents no facts in the summary judgment evidence to support
Plaintiff's accusation that the City's policymakers (the Mayor,
City Council and/or Chief of Police) removed "accountability and
supervisory responsibilities" from its supervisors and placed in
individual officers discretion "to use excessive force on others
and violat[e] their individual rights."

   The uncontroverted summary judgment evidence produced by
Holley himself demonstrates his mischaracterization of the City's
official policy.   According to Standard Operating Procedure
200/2.22,

---

[36] Document No. 150 at 18 of 27 to 20 of 27.

21

IV.   A supervisor will make the scene in any of the
following situations involving use of force:

A.   Whenever force is used by an employee that
results in an injury to any person.[37]

The Use of Force Policy provides:

**Definitions**

***Bodily Injury.*** An injury causing physical pain, illness,
or any impairment of the function of any bodily member or
organ.

.  .  .

**Documentation**

Except as noted in General Order 200-16 section 2,
*Outside City of Houston*, an incident report will always
be completed when any of the following occur:

- A baton or OC spray is used.

- A firearm or soft-impact weapon is discharged.

- Any form of force is used resulting in any
type of bodily injury.

.  .  .

Incident reports will contain the following:

a.   The names and employee numbers of:

.  .  .

2.   The supervisor assigned to the incident.

.  .  .

If the on-scene investigation reveals violations of
department policy regarding the use of force, the

---

[37] Document No. 151 at 14 of 21 to 15 of 21.

supervisor will contact the Internal Affairs Division for
direction. . . .[38]

The reporting and supervisory requirements of Standard Operating
Procedure 200/2.22 and General Order 600-17 thus foreclose Holley's
argument "that the very language in [the City's] official policy"
was to take the accountability and supervisory responsibilities out
of the hands of its supervisors and place discretion into the hands
of officers to make "exceptions to use excessive force on others
and violat[e] their constitutional rights."

The fact that several officers in this instance did violate
Holley's constitutional rights, and that the Offending Officers'
supervisor failed properly to discharge his responsibilities, do
not raise a fact issue that such misconduct was in accord with a
supposed policy adopted by the City's policymakers. To demonstrate
an abdication of the supervisory authority required by the official
written policy requires a showing of a pattern of widespread
similar incidents from which one may find or impute to the
policymakers an official policy for which the City may be liable.
See Thompson v. Upshur Cnty., 245 F.3d 447, 459 (5th Cir. 2001)
(citations omitted) ("Proof of more than a single instance of the
lack of training or supervision causing a violation of
constitutional rights is normally required before such lack of
training or supervision constitutes deliberate indifference. The

---

[38] Document No. 151-1 at 10 of 21 to 13 of 21.

plaintiff must generally demonstrate at least a pattern of similar

violations."). Holley has not provided evidence of a pattern of

similar violations. Thus, the City is entitled to summary judgment

on Holley's failure to supervise claim.

D.   Ratification

In regard to ratification, Holley argues that

> Additionally, and instantaneously during the beating of
> Holley, Defendant City of Houston's own helicopter
> surveillance captured the entire incident on video. As
> soon as this fact was made known to the officer below
> that everything was in fact captured on video, the on the
> ground officer stated, "I hope not, I'll call you . . . ."
> This is nothing more than an admission of guilt by
> Defendant and its officers. Defendant knew in that
> moment that their official conduct was egregious and
> would not have been received well if it was to be leaked
> to the public. It was in that very moment that Defendant
> Ratified its officers conduct, kept the incident
> completely quiet, and not conduct any investigations
> thinking, there would be no other footage to hold
> Defendant accountable for the horrific acts that its
> officers were always permitted to do.[39]

According to the Supreme Court, "[i]f the authorized policymakers

approve a subordinate's decision and the basis for it, their

ratification would be chargeable to the municipality because their

decision is final." City of St. Louis v. Praprotnik, 108 S. Ct.

915, 926 (1988).

Here, Holley does not produce evidence that any of the City's

policymakers was aware of the helicopter surveillance footage, nor

---

[39] Document No. 150 at 19 of 27.

did Holley produce any evidence that the City's policymakers at any time approved the unconstitutional conduct of the Offending Officers.   To the contrary, as previously observed, when the incident came to light, the City fired each of the Offending Officers and indefinitely suspended their supervisor.   The City is entitled to summary judgment on Holley's claim that the City ratified the Offending Officers' actions.

E.   Failure to Investigate

Holley argues that the City faces Section 1983 liability because the Offending Officers did not document the incident, nor did Sergeant McClellan conduct any investigation into the incident even though he was present at the scene.   The City argues correctly, quoting Grandstaff v. City of Borger, 779 F.2d 1129 (5th Cir. 1986), that a failure to discipline illegal conduct is not sufficient to "supply the necessary linkage to establish a city policy."[40]   "An inadequate investigation following the subject incident will not sustain a claim of municipal liability, because the after-the-fact inadequate investigation could not have been the legal cause of the plaintiff's injury." Feliciano v. City of Miami Beach, 847 F. Supp. 2d 1359, 1367 (S.D. Fla. 2012) (citing Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999)); see also Andrews v. Fowler, 98 F.3d 1069, 1079 (8th Cir. 1996) ("While

---

[40] Document No. 141 at 15 of 16.

25

Price's failure to investigate the rape may have violated state law and common sense, it did not rise to the level of a separate constitutional violation of Andrews' rights."). Here, as observed, the uncontroverted summary judgment evidence is that the City did investigate this incident as soon as the IAD and then Chief McClelland, the policymaker, were informed of the incident, that Chief McClelland himself was listed as the complainant and, after investigating, he terminated all four of the Offending Officers and indefinitely suspended their supervisor.[41]  The City is entitled to summary judgment on Holley's claim of failure to investigate.

### IV.  Order

For the foregoing reasons, it is

ORDERED that Defendant City of Houston's Motion for Summary Judgment (Document No. 141) is GRANTED, and Plaintiff Chad Holley's claims against the City of Houston are DISMISSED with prejudice.

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this 23rd day of October, 2015.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

---

[41] Document No. 141, ex. A at 17; Document No. 141-4 at 114 of 154.